# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.

SECURITY STATE BANK, a Kansas bank,

    Plaintiff,

v.

GUARANTY BANK & TRUST COMPANY, a Colorado bank,

    Defendant.

## COMPLAINT

Plaintiff Security State Bank ("SSB"), for its complaint against Defendant Guaranty Bank & Trust Company ("GBTC"), states as follows:

### PARTIES, JURISDICTION AND VENUE

1. SSB is a bank chartered in the State of Kansas. Its principal place of business is located at 506 Main Street, Scott City, Kansas 67871.

2. GBTC is a banking corporation incorporated in the State of Colorado. Its principal place of business is 1331 17th Street, Suite 200, Denver, Colorado 80202.

3. GBTC is the successor in interest by merger of Home State Bank ("HSB"), a Colorado banking entity that entered into a series of participation agreements with SSB between June 2006 and July 2008.

4. The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because complete diversity exists between the parties and the amount in controversy exceeds $75,000, exclusive of costs and interest.

5. The Court has personal jurisdiction over Defendant because Defendant is a citizen and domiciliary of Colorado and a Colorado banking corporation.

6. This Court is a proper venue for resolving this dispute, pursuant to 28 U.S.C. § 1391(b) because Defendant resides within the District of Colorado and the events or omissions giving rise to the claim occurred in the District of Colorado.

## GENERAL ALLEGATIONS

7. Plaintiff SSB is in the business of banking, including making loans to outside parties and purchasing participation in loans made by other banks.

8. Beginning in 2006, HSB made a series of loans to Cozens Pointe, LLC ("Cozens") a Colorado limited liability company created by Gerald Ashbach ("Ashbach") in 2006 for the purpose of developing vacation condominium properties in Fraser, Colorado.

9. The first such loan was a $4,320,000.00 line of credit that was made on or about June 26, 2006, which HSB assigned loan number 54210755 and which SSB tracked as loan number 64915 (the "64915 Loan"). The collateral for the 64915 Loan was the land underlying the Cozens Pointe development. Also on or about June 26, 2006, HSB and SSB entered into a participation agreement, under which SSB agreed to purchase a participation in draws on the line of credit in excess of $1,320,000.00 (the "64915 Loan Agreement"). A true and correct copy of the promissory note for the 64915 Loan and the participation agreement for the 64915 Loan Agreement are attached hereto as Exhibit A.

10. The second loan was a $6,560,000.00 line of credit that was made on or about July 11, 2007, which HSB assigned loan number 54412455 and which SSB tracked as loan number 65432 (the "65432 Loan"). Also on or about July 11, 2007, HSB and SSB entered into a

participation agreement, under which SSB agreed to purchase a participation in draws on the line of credit in excess of $1,324,000.00 (the "65432 Loan Agreement"). A true and correct copy of the promissory note for the 65432 Loan and the participation agreement for the 65432 Loan Agreement are attached hereto as Exhibit B.

11. The third loan was a $1,056,000.00 line of credit that was made on or about July 11, 2007, which HSB assigned loan number 54412412 and which SSB tracked as loan number 65434 (the "65434 Loan"). Also on or about July 11, 2007, HSB and SSB entered into a participation agreement, under which SSB agreed to purchase the entirety of each advance on the line of credit (the "65434 Loan Agreement"). A true and correct copy of the promissory note for the 65434 Loan and the participation agreement for the 65434 Loan Agreement are attached hereto as Exhibit C.

12. The fourth loan was a $656,321.00 line of credit that was made on or about July 1, 2008, which HSB assigned loan number 54412064 and which SSB tracked as loan number 66059 (the "66059 Loan"). This loan was advanced to provide Cozens additional funding to complete buildings A, B, C and D at the Cozens Pointe development. Also on or about July 1, 2008, HSB and SSB entered into a participation agreement, under which SSB agreed to purchase the entirety of each advance on the line of credit (the "66059 Loan Agreement"). A true and correct copy of the promissory note for the 66059 Loan and the participation agreement for the 66059 Loan Agreement are attached hereto as Exhibit D.

13. The fifth loan was a $507,707.00 line of credit that was made on or about July 1, 2008, which HSB assigned loan number 55412102 and which SSB tracked as loan number 66063 (the "66063 Loan"). This loan was advanced to provide Cozens additional funding to

complete buildings A, B, C and D at the Cozens Pointe development. Also on or about July 1, 2008, HSB and SSB entered into a participation agreement, under which SSB agreed to purchase the entirety of each advance on the line of credit (the "66063 Loan Agreement"). A true and correct copy of the promissory note for the 66063 Loan and the participation agreement for the 66063 Loan Agreement are attached hereto as Exhibit E.

14. Collectively, the 64915 Loan, the 65432 Loan, the 65434 Loan, the 66059 Loan and the 66063 Loan are hereinafter referred to as the "Participated Loans."

15. Collectively, the 64915 Loan Agreement, the 65432 Loan Agreement, the 65434 Loan Agreement, the 66059 Loan Agreement and the 66063 Loan Agreement are hereinafter referred to as the "Participation Agreements."

16. Each of the Participation Agreements, by the express terms thereof, is governed by Colorado law, since Colorado is the state in which both HSB and the Cozens property is located.

17. Each of the Participation Agreements requires HSB (and its successor GBTC) to remit to SSB the portion of any payments received in proportion with the appropriate *pro rata* share reflecting the extent of SSB's participation in the underlying loan. *See, e.g.,* Exhibit A at 5, §12(C) ("Seller will remit Purchaser's percentage of the Payments … not later than the close of the tenth business day following receipt of any Payments[.]")  Failure to make these payments subjects the HSB/GBTC to penalties. *See id.* at §13 ("If Seller fails to remit amounts received from Borrower that are due and payable to Purchaser as specified in this Agreement then … Seller will pay to Purchaser, in addition to the full amount of any later amounts due and payable

to Purchaser, a penalty on the later amounts equal to any penalty specified in the Promissory Note, or, if none is specified, the Promissory Note rate.")

18.     Each of the Participation Agreements contains identical language prohibiting HSB (and its successor GBTC) from taking steps compromise SSB's interest without obtaining SSB's consent.  *See, e.g.*, Exhibit A at 5, §12(A) ("Seller will not, without purchaser's written consent, reduce principal or interest with respect to the Loan or release or allow for the substitution of any Property, outside the normal course of dealing with Borrower so as to substantially reduce the possibility of repayment of the Loan.  Seller will not, without Puchaser's written consent, renew, extend or consent to the revision of the provisions of any note or security documents covered or waive any claim against Obligor.")

19.     Each of the Participation Agreements additionally contains identical language requiring HSB (and its successor GBTC) to provide certain information to SSB on request.  *See, e.g.,* Exhibit A at 5, §10 ("All Loan documents are available at Seller's office for Purchaser's inspection and copying at normal lobby hours upon reasonable advance notice and at such other times as Seller may permit.  Unless otherwise agreed, Seller will from time to time provide Purchaser with complete and current credit information regarding the following: Loan accrual status, status of principal and interest payments; financial statements, Property values and lien status, and any factual information bearing on the Borrower's continuing credit worthiness.")

20.     Each of the Participation Agreements additionally contains a provision entitling the prevailing party in any lawsuit brought to enforce the agreement to an award of court costs and reasonable attorneys' fees.  *See, e.g.,* Exhibit A at 5, §22.

21. SSB has made all payments it was required to make under the Participation Agreements, and each of them, and has otherwise fully performed all its obligations under the Participation Agreements.

22. On information and belief, HSB also had a series of other loans to Cozens and/or Ashbach in which SSB did not purchase a participation (the "Non-Participated Loans").

23. Due, in part, to secular economic conditions, the Cozens Pointe development was not initially successful and Cozens was unable to repay the Participated Loans. On or about February 10, 2009, Cozens defaulted on the Participated Loans. On information and belief, on the same date Cozens and Ashbach also defaulted on the Non-Participated Loans.

24. As of the date of default, the status of the Participated Loans was as follows:

| Loan | Balance | HSB Balance | SSB Balance | HSB Pro Rata | SSB Pro Rata |
| --- | --- | --- | --- | --- | --- |
| 64915 | $2,520,000.00 | $1,321,189.76 | $1,198,810.24 | 0.5243 | 0.4757 |
| 65432 | $5,402,923.63 | $1,324,000.00 | $4,078,923.63 | 0.245 | 0.755 |
| 65434 | $746,551.21 | $0 | $746,551.21 | 0.0 | 1.0 |
| 66059 | $619,355.45 | $0 | $619,355.45 | 0.0 | 1.0 |
| 66063 | $207,956.35 | $0 | $207,956.35 | 0.0 | 1.0 |

25. At the time of default, Cozens owed $9,496,786.64 on the Participated Loans collectively, of which SSB owned $6,851,596.88, giving it a 0.7215 *pro rata* share on the Participated Loans as a whole.

26. On information and belief, Cozens and Ashbach owed an additional $3,365,398.89 to HSB on the Non-Participated Loans at the time of default.

6

27. The Cozens Pointe property consists of five lots. At the time of default, Lots 1-2 had already been mostly developed and Lots 3-5 remained undeveloped

28. On or about March 3, 2009, a bank-ordered appraisal indicated that Lots 3-5 of the Cozens Pointe property were worth $2,239,000. Given the substantial gap between that figure and the amount owed on the Participated Loans, as well as the further loss in value that the Cozens property would undergo if it became bank-owned, HSB, with the consent of SSB, opted not to foreclose on the Participated Loans immediately on default.

29. On or about August 18, 2009, with the consent of SSB, HSB entered into a loan-modification agreement with Cozens and Ashbach, which covered both the Participated Loans and the Non-Participated Loans, to enable Cozens time to complete the building of the condominiums on Lots 1-2 and sell the units in those buildings, to resolve disputes and liens with contractors and to sell other collateral securing the Participated and Non-Participated Loans.

30. On or about March 25, 2010, another bank-ordered appraisal indicated that the value of Lots 3-5 on the Cozens Pointe property was now $1,495,000.

31. On or about November 4, 2010, with the consent of SSB, HSB entered into a first amendment to the loan-modification agreement with Cozens and Ashbach, which again covered both the Participated and Non-Participated Loans, intended to give Cozens and Ashbach additional time to raise funds to pay off the loans.

32. On or about May 20, 2011, a third bank-ordered appraisal indicated that the value of Lots 3-5 on the Cozens Pointe development was now $1,325,000.

33. At this stage it was evident that the approach that had been theretofore taken regarding the loans was not working. During the summer of 2011, extensive negotiations among

HSB, SSB, Cozens and Ashbach took place over the terms of a second amendment to the loan-modification agreement to prevent HSB from foreclosing.

34. As part of those negotiations, and with the consent of SSB and HSB, Cozens sold Lots 3-5 to PLL Holdings, LLC ("PLL"), an entity owned by a friend of Ashbach's, for $1,300,000, in the form of a vacation property valued at $800,000 and $500,000 in cash. At this point, therefore, the vacation home was the only collateral securing the 64915 Loan.

35. On or about September 28, 2011, with the consent of SSB, HSB entered into a second amendment to the loan-modification agreement with Cozens and Ashbach (the "Second Amendment"). A true and correct copy of that agreement is attached hereto as Exhibit F.

36. Under the terms of the Second Amendment, Cozens and Ashbach agreed to sell both the condominium units that had already been constructed, the vacation property received from PLL and two other properties that had previously been received in trade for Cozens Pointe condominiums and to apply the proceeds from those sales to paying down the "Borrowers' Loans," as defined in the Second Amendment. *See* Exhibit F at 4-6. Once the vacation home received from PLL was sold there was no longer any collateral securing the 64915 Loan.

37. The "Borrowers' Loans," as defined in the Second Amendment, are the Participated Loans. *See* Exhibit F at 1-2.

38. Because all parties anticipated, at the time of the Second Amendment, that the sale of the properties set forth above would not be sufficient to satisfy the debt owed on the Participated Loans, the Second Amendment provided for the creation of a Deficiency Amount, initially set at $1,600,000.00, to be repaid out of the sale of the remaining condominium units in Lots 3-5. *See* Exhibit F at 6-8.

39. Per the express terms of the Second Amendment, the Deficiency Amount is considered part of the amount owed under the "Borrowers' Loans," as defined in the Second Amendment—*i.e.*, the Participated Loans. *See* Exhibit F at 6 ("For the purposes of this Second Amendment, the Deficiency Amount shall be deemed to be included as part of the total balance owing under the Borrowers' Loans.")

40. When it agreed to HSB entering into the Second Amendment, SSB did so with the express understanding that monies received from the Deficiency Amount ("Deficiency Payments") would be applied to the Participated Loans collectively, and that it would receive 72.15% of those monies, reflecting its *pro rata* share under all the Participation Agreements.

41. This did not occur. Instead, when Cozens finally began to sell the condominiums and make Deficiency Payments in early 2016, HSB began remitting payments to SSB on those Deficiency Payments using the *pro rata* formula applicable to the 64915 Loan (*i.e.*, paying SSB 47.57% of the money received) rather than paying the full share owed under the Participation Agreements as a whole. In effect, HSB was paying SSB only under the 64915 Loan Agreement and refusing to make payments under the other Participation Agreements even though, under the terms of the Second Amendment, the Deficiency Payments it was receiving from Cozens were intended to satisfy Cozens's indebtedness under all of the Participated Loans and thus should have triggered payments under all of the Participation Agreements.

42. As soon as HSB made the first payment using the improper *pro rata*, SSB complained and asserted its right to receive payment at the 72.15% rate in a series of e-mail communications in or about February 2016. HSB refused to reconsider its position.

43. SSB raised this issue again on or about April 20, 2016, when an SSB employee, Randal Loder ("Loder"), traveled to HSB's Cleveland Street branch in Loveland, Colorado to meet with HSB's William Gamble ("Gamble") to discuss various matters, including HSB's use of the improper *pro rata*. Again, HSB refused to reconsider its position.

44. Also at the April 20, 2016 meeting, SSB, through Loder, requested to be provided certain information concerning the Participated Loans and the Participation Agreements, including financial statements that Conzens and Ashbach were required to make on an annual basis under the Second Amendment, which had not theretofore been provided by HSB. HSB refused to provide these documents or otherwise make them available for SSB's inspection.

45. In or about early September 2016, Gamble telephoned Loder to inform him that HSB had opted to extend the Second Amendment, which was set to expire on September 28, 2016, for a further two years. On that call, Loder requested to receive a copy of any materials documenting that extension, as well as the financial documents he had previously requested. HSB never provided any of those materials.

46. On or about September 7, 2016, HSB entered into an Inter-Creditor and Subordination Agreement (the "2016 ICSA") with SPH Lenders 1, LLC ("SPH"), an entity providing additional construction funding to Conzens. The 2016 ICSA subordinated HSB's (and SSB's) interest to that of SPH. A true and correct copy of the 2016 ICSA is attached hereto as Exhibit G. HSB neither sought, nor obtained, SSB's consent to enter into the 2016 ICSA, either before or after it entered into the agreement.

47. In or about September 2016, HSB merged into GBTC and GBTC, as its successor in interest, assumed all HSB's rights and obligations under the various agreements discussed herein.

48. Between February 2016 and May 2017, Cozens made $225,000 in Deficiency Payments to HSB or GBTC. HSB/GBTC applied the incorrect *pro rata* to each of these payments, resulting in underpayments in the amount of $55,305 for that period alone.

49. On or about Friday, May 19, 2017, an attorney for GBTC, John Young ("Young") contacted Loder to inform him that Cozens had offered a sum of $650,000 to retire all its remaining debts, which GBTC proposed to accept and divide using the *pro rata* applicable to 64915 Loan Agreement rather than the Participation Agreements as a whole. Young informed Loder that the deadline to respond to this offer was Wednesday, May 24, 2017.

50. During the course of later discussions relating to the proposed resolution of Cozens's debts, GBTC proposed, as an alternative, that SSB and GBTC could agree to subordinate their interests to that of a new lender who was willing to provide Cozens and Ashbach additional construction funding. During these discussions, GBTC did not disclose that HSB had previously secretly subordinated its interest to a different construction lender.

51. In part because GBTC *still* refused to provide it the basic financial information that it both needed to evaluate the proposals and was entitled to receive under the Participation Agreements, SSB rejected GBTC's proposals and expressly refused to consent to any subordination.

52. Notwithstanding this, GBTC entered into a pair of Inter-Creditor and Subordination Agreements with Allen Bldg J Lenders, LLC on June 9, 2017 and June 14, 2017

(the "2017 ICSAs"). True and correct copies of the 2017 ICSAs are attached hereto as Exhibits H and I. SSB did not consent to GBTC's entry into these agreements.

53. Between May 2017 and the present, GBTC has paid SSB $135,574.50, reflecting Deficiency Payments in the amount of $285,000 received from Cozens. Due to the application of the incorrect *pro rata* to those payments, GBTC underpaid SSB by $46,087.50.

54. Thus, all-told, GBTC and its predecessor HSB have underpaid SSB by $125,358.00 to date by applying the Deficiency Payments entirely to the 64915 Loan Agreement rather than to the Participation Agreements as a whole and therefore applying the incorrect *pro rata*.

55. On information and belief, GBTC intends to continue making payments based on the improper *pro rata* going forward as it receives additional Deficiency Payments from Cozens. If all Deficiency Payments are made, this will result in an additional underpayment of over $200,000, above and beyond the underpayments made to date.

## COUNT I
## BREACH OF CONTRACT – 64915 LOAN AGREEMENT

56. SSB expressly incorporates the allegations in paragraphs 1 through 55 of this Complaint as if they were fully set forth herein.

57. The 64915 Loan Agreement was a valid contract between SSB and HSB, and then between SSB and HSB's successor entity, GBTC.

58. SSB performed all its obligations under the 64915 Loan Agreement.

59. HSB, and then GBTC, breached the 64915 Loan Agreement by, among other things, (a) entering into subordination agreements, without the required consent of SSB, in violation of the prohibition in §12(A) of the agreement on taking steps to "substantially reduce

the possibility of repayment of the Loan" and on "renew[ing], extend[ing] or consent[ing] to the revision of the provisions of any note or security documents covered or waiv[ing] any claim against [Cozens];" and (b) by failing to provide information concerning the 64915 Loan to SSB for inspection when requested, despite having been given reasonable advance notice, as required by §10 of the agreement.

60. HSB's and GBTC's breaches of the 64915 Loan Agreement damaged SSB by, among other things, (a) significantly reducing the likelihood that it will fully recover its interest in the 64915 Loan and (b) depriving it of the information it needs, and for which it bargained in the 64915 Loan Agreement, in order to sufficiently monitor the status of the 64915 Loan and make business and strategic decisions concerning the loan.

61. As its successor in interest, GBTC is liable for HSB's breaches of contract.

## COUNT II
## BREACH OF CONTRACT – 65432 LOAN AGREEMENT

62. SSB expressly incorporates the allegations in paragraphs 1 through 61 of this Complaint as if they were fully set forth herein.

63. The 65432 Loan Agreement was a valid contract between SSB and HSB, and then between SSB and HSB's successor entity, GBTC.

64. SSB performed all its obligations under the 65432 Loan Agreement.

65. HSB, and then GBTC, breached the 65432 Loan Agreement by, among other things, (a) failing to pay the amounts due under the agreement, despite having received payments from Cozens on the underlying 65432 Loan; (b) entering into subordination agreements, without the required consent of SSB, in violation of the prohibition in §12(A) of the agreement on taking steps to "substantially reduce the possibility of repayment of the Loan" and on "renew[ing],

extend[ing] or consent[ing] to the revision of the provisions of any note or security documents covered or waiv[ing] any claim against [Cozens];" and (c) by failing to provide information concerning the 65432 Loan to SSB for inspection when requested, despite having been given reasonable advance notice, as required by §10 of the agreement.

66. HSB's and GBTC's breaches of the 65432 Loan Agreement damaged SSB by, among other things, (a) depriving it of the monies owed to it under the 65432 Loan Agreement; (b) significantly reducing the likelihood that it will fully recover its interest in the 65432 Loan; and (c) depriving it of the information it needs, and for which it bargained in the 65432 Loan Agreement, in order to sufficiently monitor the status of the 65432 Loan and make business and strategic decisions concerning the loan.

67. As its successor in interest, GBTC is liable for HSB's breaches of contract.

## COUNT III
## BREACH OF CONTRACT – 65434 LOAN AGREEMENT

68. SSB expressly incorporates the allegations in paragraphs 1 through 67 of this Complaint as if they were fully set forth herein.

69. The 65434 Loan Agreement was a valid contract between SSB and HSB, and then between SSB and HSB's successor entity, GBTC.

70. SSB performed all its obligations under the 65434 Loan Agreement.

71. HSB, and then GBTC, breached the 65434 Loan Agreement by, among other things, (a) failing to pay the amounts due under the agreement, despite having received payments from Cozens on the underlying 65434 Loan; (b) entering into subordination agreements, without the required consent of SSB, in violation of the prohibition in §12(A) of the agreement on taking steps to "substantially reduce the possibility of repayment of the Loan" and on "renew[ing],

extend[ing] or consent[ing] to the revision of the provisions of any note or security documents covered or waiv[ing] any claim against [Cozens];" and (c) by failing to provide information concerning the 65434 Loan to SSB for inspection when requested, despite having been given reasonable advance notice, as required by §10 of the agreement.

72. HSB's and GBTC's breaches of the 65434 Loan Agreement damaged SSB by, among other things, (a) depriving it of the monies owed to it under the 65434 Loan Agreement; (b) significantly reducing the likelihood that it will fully recover its interest in the 65434 Loan; and (c) depriving it of the information it needs, and for which it bargained in the 65434 Loan Agreement, in order to sufficiently monitor the status of the 65434 Loan and make business and strategic decisions concerning the loan.

73. As its successor in interest, GBTC is liable for HSB's breaches of contract.

## COUNT IV
## BREACH OF CONTRACT – 66059 LOAN AGREEMENT

74. SSB expressly incorporates the allegations in paragraphs 1 through 73 of this Complaint as if they were fully set forth herein.

75. The 66059 Loan Agreement was a valid contract between SSB and HSB, and then between SSB and HSB's successor entity, GBTC.

76. SSB performed all its obligations under the 66059 Loan Agreement.

77. HSB, and then GBTC, breached the 66059 Loan Agreement by, among other things, (a) failing to pay the amounts due under the agreement, despite having received payments from Cozens on the underlying 66059 Loan; (b) entering into subordination agreements, without the required consent of SSB, in violation of the prohibition in §12(A) of the agreement on taking steps to "substantially reduce the possibility of repayment of the Loan" and on "renew[ing],

extend[ing] or consent[ing] to the revision of the provisions of any note or security documents covered or waiv[ing] any claim against [Cozens];" and (c) by failing to provide information concerning the 66059 Loan to SSB for inspection when requested, despite having been given reasonable advance notice, as required by §10 of the agreement.

78. HSB's and GBTC's breaches of the 66059 Loan Agreement damaged SSB by, among other things, (a) depriving it of the monies owed to it under the 66059 Loan Agreement; (b) significantly reducing the likelihood that it will fully recover its interest in the 66059 Loan; and (c) depriving it of the information it needs, and for which it bargained in the 66059 Loan Agreement, in order to sufficiently monitor the status of the 66059 Loan and make business and strategic decisions concerning the loan.

79. As its successor in interest, GBTC is liable for HSB's breaches of contract.

## COUNT V
## BREACH OF CONTRACT – 66063 LOAN AGREEMENT

80. SSB expressly incorporates the allegations in paragraphs 1 through 79 of this Complaint as if they were fully set forth herein.

81. The 66063 Loan Agreement was a valid contract between SSB and HSB, and then between SSB and HSB's successor entity, GBTC.

82. SSB performed all its obligations under the 66063 Loan Agreement.

83. HSB, and then GBTC, breached the 66063 Loan Agreement by, among other things, (a) failing to pay the amounts due under the agreement, despite having received payments from Cozens on the underlying 66063 Loan; (b) entering into subordination agreements, without the required consent of SSB, in violation of the prohibition in §12(A) of the agreement on taking steps to "substantially reduce the possibility of repayment of the Loan" and on "renew[ing],

extend[ing] or consent[ing] to the revision of the provisions of any note or security documents covered or waiv[ing] any claim against [Cozens];" and (c) by failing to provide information concerning the 66063 Loan to SSB for inspection when requested, despite having been given reasonable advance notice, as required by §10 of the agreement.

84. HSB's and GBTC's breaches of the 66063 Loan Agreement damaged SSB by, among other things, (a) depriving it of the monies owed to it under the 66063 Loan Agreement; (b) significantly reducing the likelihood that it will fully recover its interest in the 66063 Loan; and (c) depriving it of the information it needs, and for which it bargained in the 66063 Loan Agreement, in order to sufficiently monitor the status of the 66063 Loan and make business and strategic decisions concerning the loan.

85. As its successor in interest, GBTC is liable for HSB's breaches of contract.

## COUNT VI
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

86. SSB expressly incorporates the allegations in paragraphs 1 through 85 of this Complaint as if they were fully set forth herein.

87. In the alternative to the foregoing breach of contract claims, GBTC and HSB breached the implied covenant of good faith and fair dealing in the Participation Agreements.

88. Like all contracts, the Participation Agreements each contained an implied covenant of good faith and fair dealing.

89. The implied covenant serves to effectuate the intentions of the parties at the time the agreement was entered into and to honor their reasonable expectations.

90. At the time the parties entered into each of the Participation Agreements, it was the parties' intention that SSB would be paid under the Participation Agreements as money came in to HSB on the underlying loans. Moreover, SSB reasonably expected the same.

91. Additionally, at the time the parties entered into each of the Participation Agreements, it was the intention of the parties, and the reasonable expectation of SSB, that HSB (or any successor in interest to it) would not take any steps to artificially manipulate the flow of money received from Cozens to unjustly increase payments to itself by allocating funds received from Cozens to the 64915 Loan, on which it received a higher percentage of payments, rather than allocating those funds fairly across all the Participated Loans.

92. Nothing in any of the Participation Agreements expressly or implicitly authorized HSB or GBTC to allocate funds coming from Cozens in a way that unfairly maximized payments to itself under the Participation Agreements and avoided making payments to SSB under the same.

93. Yet HSB, and then GBTC, did precisely that, usurping the benefit of the contracts, by taking in money from Cozens intended to satisfy Cozens's indebtedness under all the participated loans and paying out under the *pro rata* share applicable only to the 64915 Loan Agreement rather than the *pro rata* applicable to Participation Agreements taken as a whole.

94. These improper *pro rata* payments have already cost SSB over $100,000 in underpayments and will, if permitted to continue, cost SSB hundreds of thousands more as money that comes in from Cozens in the future continues to be paid at the improper *pro rata*.

95. To the extent that HSB's and GBTC's actions in this respect are not express breaches of the Participation Agreements, they are, at a minimum, an abuse of HSB's and

GBTC's discretion under the Participation Agreements and, thus, a violation of the implied covenant of good faith and fair dealing.

96.   As its successor in interest, GBTC is liable for HSB's breaches of the implied covenant of good faith and fair dealing.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff SSB requests that:

1. The Court award judgment in its favor and against Defendant GBTC;

2. Defendant GBTC be ordered to pay damages in an amount to be determined at trial, but exceeding $75,000, to compensate SSB for the losses it has suffered as a consequence of the afore-described misconduct, including, but not limited to, the underpayments caused by applying the improper *pro rata* for all payments made up through the date of judgment, as well as the contractual penalties owed due to the underpayment/non-payment of the amounts due;

3. Defendant GBTC and its agents, officers, employees, representatives and all other persons and entities acting for, with, by, through, or under the authority from Defendant, be enjoined permanently from paying the improper *pro rata* under the Participation Agreements and that the same be ordered to make all future payments according to the proper *pro rata*;

4. Defendant GBTC and its agents, officers, employees, representatives and all other persons and entities acting for, with, by, through, or under the authority from Defendant, be enjoined permanently from withholding documents requested by

SSB pursuant to the Participation Agreements documents paying the improper *pro rata* under the Participation Agreements;

5. Defendant GBTC and its agents, officers, employees, representatives and all other persons and entities acting for, with, by, through, or under the authority from Defendant, be enjoined permanently from entering into any further or future subordination agreements or other agreements concerning the Participation Agreements or the Participated Loans without the express, written, prior consent of SSB;

6. Defendant GBTC be ordered to pay to SSB all costs and attorney's fees incurred during this litigation or otherwise with respect to efforts, prior to this litigation, to obtain HSB's or GBTC's compliance with the terms of the Participation Agreements;

7. Any other relief allowed by applicable statute and as the Court may deem just and proper.

Date: September __, 2017

Respectfully submitted,

 /s/ Ann M. Schroeder
Ann M. Schroeder
SPENCER FANE LLP
370 17th St., Ste. 4800
Denver, CO 80202
303-839-3800
aschroeder@spencerfane.com

*Attorney for Plaintiff
Security State Bank*